# PECHMAN LAW GROUP PLLC
A T T O R N E Y S   A T   L A W

**488 MADISON AVENUE**
**NEW YORK, NEW YORK 10022**
**(212) 583-9500**
**WWW.PECHMANLAW.COM**

January 14, 2021

**VIA ECF**

Honorable John G. Koeltl
United States District Court
Southern District of New York
500 Pearl Street, Courtroom 14A
New York, NY 10007

>    Re:  *Perez v. Mexican Hospitality Operator, LLC*, 19 Civ. 7403
>         (JGK)(KNF) (Joint Letter-Motion for Settlement Approval)

Dear Judge Koeltl:

We represent named plaintiffs Juan Perez, Ana Dorantes, Daniele Flumiani, Adrian Hernandez, Jesus Nava, Fabio Reyes, and Angel Tepole (collectively, "Named Plaintiffs") and opt-in plaintiffs Elizabeth Castelan, Eulises Cortez, Agustin Diaz, Francisco Garcia, Wuilber Garcia, Giovanni Hernandez, Cesar Mendoza, and Sergio Ramirez (collectively, "Opt-In Plaintiffs," and together with Named Plaintiffs, "Plaintiffs") in the above-referenced wage-and-hour action against defendants Mexican Hospitality Operator LLC d/b/a Cosme, Cosme NY LLC d/b/a/ Cosme (collectively, "Cosme"), Enrique Olvera, and Daniela Soto-Innes (collectively, "Defendants," and together with Plaintiffs, the "Parties"). Plaintiffs submit this letter-motion seeking approval of the Parties' executed settlement agreement (the "Agreement"), enclosed as Exhibit 1, with the consent of Defendants. For the reasons set forth in detail below, the Court should approve the Agreement and dismiss this Action with prejudice but retain jurisdiction over it for purposes of enforcing the terms of the Agreement.

### PROCEDURAL AND FACTUAL HISTORY

In January 2019, one of the Plaintiffs consulted with Plaintiffs' counsel, Pechman Law Group PLLC ("PLG"), about wage payment issues at Cosme (*see* enclosed Exhibit 2, PLG's contemporaneous time records for this Action). From approximately January through June 2019, PLG reviewed documents, wage payment practices at Cosme, and potential damages. In February 2019, PLG sent a demand letter to Cosme. Until July 2019, PLG communicated at various points with Defendants' former counsel, Gordon & Rees LLP (*see* ECF Nos. 28–29), about a potential resolution. When settlement discussions failed by the end of June 2019, PLG began interviewing the other Named Plaintiffs to discuss a potential class and collective action. This process lasted until August 2019 and included thorough discussions with each Named Plaintiff about his or her experiences working at Cosme and documents received at the restaurant (*e.g.*, wage statements, time

Hon. John G. Koeltl
January 14, 2021
Page 2 of 9

records, tip-related records, and voice recordings). From July through August 2019, PLG also met with and conducted the same intake process with the Opt-In Plaintiffs.

The Named Plaintiffs filed their Collective and Class Action Complaint on August 8, 2019 (ECF No. 1), alleging that Cosme's wage payment practices violated provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), and the New York Labor Law ("NYLL"). In particular, the Named Plaintiffs claimed that Defendants unlawfully: (a) took a tip credit against tipped employees' wages by failing to comply with all tip credit notice requirements under the FLSA and NYLL; (b) required tipped employees to share portions of their tips with tip-ineligible silverware polishers, kitchen expediters, and managerial shift leaders; (c) failed to furnish tipped employees with accurate wage statements with each payment of wages in violation of the Wage Theft Prevention Act, NYLL § 195 ("WTPA"); and (d) failed to furnish tipped employees with wage notices upon hiring in violation of the WTPA. Upon these allegations, the Named Plaintiffs sought to recover, on behalf of themselves and all similarly situated tipped employees of Cosme, their allegedly unpaid minimum and overtime wages, misappropriated gratuities, liquidated damages, statutory damages, pre- and post-judgment interest, and attorneys' fees and costs. The Opt-In Plaintiffs filed consents to become party plaintiffs in this Action between August 14 and 23 and on September 11, 2019 (ECF Nos. 12–25, 29).

Defendants' counsel of record, Alexander Wilde Leonard and Jeffrey Alan Miller of Golenbock Eiseman Assor Bell & Peskoe LLP ("Defense Counsel"), appeared on behalf of Defendants on August 26, 2019 (ECF Nos. 26–27).[1] Defendants' prior counsel accepted service on behalf of Defendants on October 1, 2019 (ECF No. 31). On December 9, 2019, Defendants filed an Answer (ECF No. 38), in which they generally denied all material allegations in the Collective and Class Action Complaint, asserted numerous affirmative defenses, and claimed that they had at all times complied with the requirements of the FLSA and NYLL. Namely, with respect to Plaintiffs' specific claims, Defendants produced evidence that, according to Defendants, showed the employees were provided accurate wage statements and rate of pay notices under the WTPA, provided all legally required notices that a tip credit would be applied on account of the tips they received, and that no tips were required to be shared with any tip ineligible positions, including but not limited to so-called shift leaders, silverware polishers, and kitchen expediters. According to Defendants, those employees were truly tip-eligible servers, runners, and bussers. Soon afterwards, on December 12, 2019, the Parties submitted a joint Rule 26(f) report, which the Court so-ordered (ECF No. 41).

From the first communication with Defense Counsel on August 26, 2019, PLG, on behalf of Plaintiffs, mentioned the possibility of mediating the Parties' disputes to attempt to preserve resources and reach a potential resolution. *See* Ex. 2 at 8/26/19. With this goal in mind, the Parties discussed a confidential exchange of information for settlement purposes only. To this end, on January 22, 2020, the Parties filed a stipulated proposed order (ECF No. 43), which the Court so-ordered on January 24, 2020 (ECF No. 44). In late January 2020, Plaintiffs drafted and served discovery requests and

---

[1]  As noted, Defendants were first represented by other attorneys (ECF Nos. 28–29), but those attorneys withdrew as counsel for Defendants on October 31, 2019 (ECF Nos. 34, 40).

Hon. John G. Koeltl
January 14, 2021
Page 3 of 9

interrogatories. On February 6, 2020, Defendants produced approximately 6,000 pages of payroll records, tip pool sheets, and individual personnel files for each Plaintiff. On March 6, 2020, Defendants produced additional payroll records, wage notices, wage statements, and handbook information, totaling approximately 6,000 more pages of materials. In total, Defendants produced approximately 12,100 pages of information by the beginning of March 2020 in support of their defenses.

Relying on the information produced, PLG devoted the remainder of March and beginning of April to evaluating potential damages on an individualized basis for each Plaintiff. On April 8, 2020, PLG submitted its alleged damages spreadsheet to Defense Counsel with a line-by-line explanation of all formulas, methodologies, assumptions, and legal theories supporting the calculation. Unfortunately, it was also at this time that the COVID-19 pandemic struck New York with full force, requiring government officials to issue shutdown and stay-at-home orders that decimated the hospitality industry, including Cosme, which remains closed to the public as of the date of this letter. All subsequent settlement discussions with Defendants took into account the devastating effects that the pandemic has had on their restaurant business and the ability that this (much more limited) business had to satisfy any judgment and/or settlement if the matter continued. As is discussed in further detail below, the pandemic's toll on Defendants' business also required PLG to negotiate additional settlement terms to protect payment to Plaintiffs.

From April through September 2020, the Parties negotiated a potential settlement amount. PLG updated Plaintiffs in both Spanish and English on Zoom calls and via emails about the status of the potential settlement, settlement offers exchanged, and potential settlement terms. The Parties reached a settlement in principle in early October 2020 on an individual (*i.e.*, non-class or -collective) basis. PLG drafted the first version of the Agreement, then continued negotiating remaining settlement terms with Defense Counsel from October through the beginning of December 2020. Throughout this time, PLG also discussed the distribution of settlement amounts with all Plaintiffs, how these amounts were calculated, and that a small change needed to be made to Plaintiffs' initial damages calculations to account for absences and a longer period of employment for one of the Plaintiffs based on new records received. Ultimately, all Plaintiffs agreed to the final distributions reflected in the Agreement and signed it between December 18 and 21, 2020, and Defendants have since countersigned the Agreement.

### THE SETTLEMENT IS FAIR AND REASONABLE

Pursuant to *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015), and the Court's Order dated December 16, 2020 (ECF No. 56), the Parties submit this Joint Letter-Motion, with the enclosed executed Agreement, requesting that the Court approve their settlement and dismiss this matter with prejudice but retain jurisdiction over it for purposes of enforcement of the terms of the Agreement.

Hon. John G. Koeltl
January 14, 2021
Page 4 of 9

## I. Plaintiffs' Highest Possible Damages and the Settlement Amount

PLG calculated Plaintiffs' highest possible collective damages to be $947,340.42. This figure assumed a complete victory for Plaintiffs on all disputed claims discussed below. The $947,340.42 figure equals the sum of the following amounts:

- $206,202.75 in alleged unpaid minimum wages (*i.e.*, tip credit for regular hours);
- $3,518.22 in alleged unpaid overtime wages (*i.e.*, tip credit for overtime hours);
- $164,686.38 in alleged misappropriated gratuities;
- $374,407.35 in alleged liquidated damages under the NYLL;
- $75,000.00 in alleged WTPA damages; and
- $123,525.73 in alleged pre-judgment interest under the NYLL.

Pursuant to the Agreement, Cosme has paid $175,000 (the "Settlement Payment") to a third-party settlement administrator, AB Data, to hold until and unless the settlement is fully and finally approved by the court and all other conditions under the Agreement are satisfied, to settle the Parties' disputes. Cosme retained AB Data to help administer the settlement for administrative ease as well as to help ensure that the proposed settlement funds are available to Plaintiffs should this settlement be approved, given the precarious nature of the hospitality industry in New York City due to COVID-19. Cosme has already funded the fee for AB Data's administration services (estimated to be up to $4,000) *separately* from the Settlement Payment. The Settlement Payment represents a fair and reasonable compromise over contested disputes.

## II. The Settlement Resolves Bona Fide Disputes

The Agreement resolves bona fide disputes over sharply contested issues that present significant risks to Plaintiffs' potential recovery.

First, Plaintiffs claim that Defendants were not entitled to take a tip credit against their wages because they allegedly failed to comply with the tip credit notice requirements of the FLSA and NYLL. *See* 12 N.Y.C.R.R. § 146–2.2; *see also Hristova v. 3321 Astoria Inc.*, No. 17 Civ. 1633 (RER), 2018 WL 4006880, at *4 (E.D.N.Y. June 27, 2019) (finding completed WTPA notice was insufficient notice of tip credit because it failed to state "that the tip allowance offsets the minimum wage requirements or that employees must retain all tips"). In response, Defendants produced NYLL § 195 wage notices provided to and signed by each Plaintiff. The notices reflect the tipped minimum wage rate paid to each Plaintiff and the tip credit amount taken against his or her minimum wage rate. For several Plaintiffs, Defendants also produced an accompanying employment letter provided to Plaintiffs at the time of hiring stating the tip credit amount taken per hour against the applicable "legal minimum wage." For example, Named Plaintiff Angel Tepole received a letter stating that his "hourly wage shall be [the] legal minimum wage, minus tip credit. . . . Allowances taken for tips are $3.50 per hour." Plaintiffs argue that the notices and letters do not satisfy the strict written tip credit notice requirements of the Hospitality Wage Order. 12 N.Y.C.R.R. § 146–2.2. Defendants stand by their notices and claim that Plaintiffs plainly received all information concerning their

receipt of gratuities, that part of those gratuities would apply as a tip credit, and that any alleged defect in the notices is technical and does not invalidate Defendants' ability to take a tip credit. *See, e.g.*, *Marin v. Apple-Metro, Inc.*, No. 12 Civ. 5274 (ENV)(CLP), 2020 WL 6157011, at *7–8 (E.D.N.Y. Oct. 21, 2020); *Ahmed v. Morgan's Hotel Grp. Mgmt., LLC*, 160 A.D.3d 555, 556 (1st Dep't 2018) (upholding dismissal of technical violations in tip credit notice). If the Court sides with Defendants on this issue, Plaintiffs would recover no damages under NYLL § 198(1–b) and lose the ability to recover the tip credit taken against their wages per hour worked, *i.e.*, allegedly unpaid minimum and overtime wages, as well as associated liquidated damages and interest.

Second, Plaintiffs claim that their weekly wage statements failed to reflect the tip credit taken against their wages and the full minimum wage rate. In response, Defendants produced sample paystubs (*i.e.*, wage statements) for every year from 2014 through 2018. Except for paystubs from 2014, all of Plaintiffs' paystubs contained a note with all legally required information at the bottom under a "memo" heading reflecting both the tip credit taken against the minimum wage rate and their tipped minimum wage rates paid. Defendants argue that any alleged violations, which they deny, are technical and subject to the defenses of NYLL § 198(1–d). Plaintiffs respond that the Hospitality Wage Order and the WTPA both require specific information on wage statements, such as the full minimum wage rate and the allowances taken against it. *See* N.Y. Lab. Law § 195(3); 12 N.Y.C.R.R. § 146–2.3. Defendants claim that all wage rates and allowances were on the paystub. Again, the Court would have to decide this legal issue. A decision in favor of Defendants would result in no recovery to Plaintiffs under NYLL § 198(1–d).

Third, Plaintiffs claim Defendants also lost their ability to take a tip credit against their wages by requiring Plaintiffs to share their tips with allegedly tip-ineligible shift leaders, silverware polishers, and kitchen expediters. According to Plaintiffs, because shift leaders are really "employers" (*i.e.*, managers) and polishers and expediters do not engage in any meaningful interactions with Cosme's clients, none is entitled to participate in the restaurant's tip pool. *See, e.g.*, 12 N.Y.C.R.R. § 146–2.14; *Gomez v. MLB Enters. Corp.*, No. 15 Civ. 3326 (CM), 2018 WL 3019102, at *6 (S.D.N.Y. June 5, 2018) (citing *Shariar v. Smith & Wollensky Rest. Grp. Inc.*, 659 F.3d 234, 240 (2d Cir. 2011)). In response, Defendants contend that shift leaders, or "captains," were akin to maître ds or experienced waiters who, like other waiters, addressed customers' complaints and could not in any way control the terms of employment of Plaintiffs. As such, they were not "employers" and were entitled to participate in the tip pool given their direct service to guests. Defendants further claim that polishers and expediters were not separate job titles but were truly "bussers" and "runners" who performed tip-earning duties for the duration of their shifts. They were therefore also entitled to receive tips. Finally, Defendants counter that, in any event, Plaintiffs' allegations do not invalidate the tip credit. *See Murphy v. Lajaunie*, No. 13-CV-6503, 2016 WL 1192689, at *4–5 (S.D.N.Y. Mar. 22, 2016) (Sullivan, D.J.) (finding NYLL § 196–d, which "plainly states that '[n]othing in this subdivision shall be construed as affecting the allowances from the minimum wage for gratuities in the amount determined in accordance with the provision of article nineteen of this chapter,'" means the "unambiguous text" of NYLL § 196-d, unlike that of 29 U.S.C. § 203(m), "does not entitle plaintiffs to the windfall of the tip credit"); *Schear v. Food Scope Am., Inc.*, 297 F.R.D. 114, 133–34 (S.D.N.Y. 2014) (Torres, D.J.) (same). Again, if the Court sides with

Hon. John G. Koeltl
January 14, 2021
Page 6 of 9

Defendants' position, Plaintiffs would not recover the tip credit taken against their wages, damages for other tip-related claims, and associated liquidated damages and interest.

Finally, Plaintiffs claim they are entitled to recover the gratuities paid to shift leaders, silverware polishers, and kitchen expediters under the Cosme tip pool. In response, Defendants claim that these positions were lawfully entitled to participate in the Cosme tip pool, as noted in the previous paragraph. A jury would have to resolve this final dispute to determine what each position's primary work duties were and to calculate how much, if any, of the tips received per shift should have been redistributed to Plaintiffs as part of the Cosme tip pool. This dispute can only be resolved following a lengthy trial with the Parties incurring significant expenses. If a jury found that only the kitchen expediter position was unlawfully included in the Cosme tip pool, Plaintiffs' recovery for this claim could be significantly reduced to approximately $47,000. If a jury agreed with Defendants' argument in its entirety, Plaintiffs would not recover any of the gratuities paid to other positions in the tip pool or liquidated damages or interest.

Besides the risks they would face in litigation, Plaintiffs accepted the proposed settlement because they recognize the financial difficulties Cosme faces in the wake of the COVID-19 pandemic. Defendants' restaurant closed from late March 2020 onward. Since then, it was open for only a brief time period on a limited basis. Unfortunately, outdoor dining is not possible at the restaurant, and indoor dining was abandoned due to capacity restrictions (and since last month, the closure of all indoor dining under New York City's most recent orders). Against the continued realities of the pandemic, it is uncertain how long Cosme will remain in business. Plaintiffs are realistic and understand these risks, especially here where there is considerable alleged liability against one individual restaurant. They have accepted a settlement that is less than their best possible day in court in exchange for the guarantee of receiving a reasonable and fair payment in the near future.

Based on the foregoing, the Settlement is reasonable and should be approved. To resolve the Action, Cosme has paid the gross Settlement Payment of $175,000 to AB Data, inclusive of attorneys' fees and costs. Ex. 1 § 1(A)(1).[2] Of this amount, Plaintiffs will receive the Allocations (*i.e.*, the distributions) reflected in the Agreement. *See id.* (chart reflecting Allocations). Cosme will pay all settlement administration fees related to AB Data (estimated to be up to $4,000). Taking into account the risks discussed, and based on Plaintiffs' calculations, (i) the Settlement Payment here far exceeds Plaintiffs' highest possible damages if their only prevailing claim is that the kitchen expediters should not have been included in the Cosme tip pool, and (ii) assuming that Plaintiffs established

---

[2]   It was originally contemplated in the executed Agreement that Defendants' Counsel would receive checks payable to Plaintiffs for all amounts owed under the settlement, which Plaintiffs required to be in the form of registered, certified or bank checks, and Defendants' Counsel would hold them in escrow until remitted to Plaintiffs. However, this structure ultimately proved difficult to accomplish because of the W-2 payments payable to Plaintiffs (*i.e.*, less tax withholdings and deductions) pursuant to the Agreement and associated reporting obligations. Therefore, the Parties agreed that AB Data would be retained, at Cosme's sole expense apart from the Settlement Payment, to hold the at-issue settlement funds until full and final settlement approval occurs and would be responsible for making all tax calculations and remittances.

that shift leaders, kitchen expediters, and polishers should not have been in the tip pool, their highest possible tip disgorgement damages (or what they truly "lost") are $164,686.38, lower than the Settlement Payment. Although PLG believes Plaintiffs have strong claims, counsel is realistic and recognizes it is unlikely that a jury will credit only Plaintiffs' allegations, especially because Defendants have posed serious legal and factual arguments as well as ample documentary evidence in response to Plaintiffs' claims. Counsel and Plaintiffs also recognize that the pandemic has had a significant impact on their chances of recovery. Even if Plaintiffs fully succeeded through trial, there is no guarantee that Defendants will still be able to pay the Settlement Payment by then, much less a significant judgment against them.

### III. The Settlement Is Reasonable and Should Be Approved

The Parties settled this matter in large part to avoid costly litigation and the risks associated with collecting on a judgment against a potentially closed single restaurant in this current pandemic environment, as well as the possibility of not collecting anything from the individually named Defendants. Should this case continue, the Parties would have to complete document discovery and take and defend the depositions of Plaintiffs, Defendants, and third parties. Afterwards, either Party could move for summary judgment. Defendants could also move to decertify the FLSA collective action. In either event, the Court's decisions on several legal issues, *see supra* Section II, could severely impact Plaintiffs' potential recovery. In this regard, if the Court concluded that Defendants were entitled to take a tip credit against Plaintiffs' wages, there would no longer be a claim against Defendants for unpaid wages under the FLSA. *See* ECF No. 1. If this occurred, the Court could decline to exercise supplemental jurisdiction over all remaining NYLL claims, requiring the Parties to recommence their disputes in state court. Assuming summary judgment were denied (or granted in part and the Court retained jurisdiction), the Parties would proceed to trial followed by potential appeals. Proceeding with the litigation would consume significant amounts of time and resources, possibly including the resources used to resolve the Action.

Mindful of today's economic environment and Defendants' statements about their financial difficulties, PLG negotiated several provisions of the Agreement to ensure to the highest extent possible that payment is made to Plaintiffs. First, in agreement with Plaintiffs, Cosme has already retained AB Data to serve as a third-party settlement administrator (at Cosme's sole expense, separate from the Settlement Payment) and has already funded the entire Settlement Payment and estimated administration fee. This process differs from the settlement mechanics outlined in the Agreement, but it was agreed to by all Parties due to administrative problems later discovered with obtaining certified, registered, or cashier's checks for W-2 payments. *See supra* at n.2; *cf.* Ex. 1 § 1(A)(2). As such, Cosme has funded the money in advance and secured it with AB Data until and unless the Court fully and finally approves the Agreement and all conditions to payment in the Agreement are satisfied. Moreover, the Parties jointly request that the Court retain jurisdiction over this Action for purposes of enforcing the Agreement should any issues arise. *Id.* § 4(J). The retained settlement administrator will deliver the settlement checks to PLG within seven calendar days of the Court's dismissal with prejudice of the Action. *Id.* § 3(B). Most importantly, this settlement provides immediate

Hon. John G. Koeltl
January 14, 2021
Page 8 of 9

financial relief, with an average payment of $7,760 to Plaintiffs who all work in the restaurant industry and have likewise suffered severe economic hardship these last several months due to the industry-wide shutdowns and restrictions.

Following months of extensive negotiations, the Parties agreed to the settlement embodied in the Agreement. The Agreement's terms are consistent with *Cheeks*. For example, the release in the Agreement is limited to Plaintiffs' wage-and-hour claims. *See id.* § 2. The Agreement contains a limited confidentiality provision that bars PLG and Plaintiffs from talking about the litigation and Settlement to the media (*e.g.*, news) and on social media outlets. *Id.* § 4(C). However, Plaintiffs are otherwise free to share "their experiences working at Cosme or litigating and resolving the Litigation" and PLG is free to reference the Action in its own website. *Id.* This type of limited and narrowly tailored confidentiality clause is acceptable under *Cheeks*. *See, e.g.*, *Chun Lan Guan v. Long Island Business Institute, Inc.*, No. 15 Civ. 2215 (CBA)(VMS), 2020 WL 1289517, at *3 (S.D.N.Y. Mar. 18, 2020); *Lola v. Skadden, Arps, Meagher, Slate & Flom LLP*, No. 13 Civ. 5008 (RJS), 2016 WL 922223, at *2 (S.D.N.Y. Feb. 3, 2016). The Agreement does not contain non-disparagement or no re-hire clauses. *See* Ex. 1.

Pechman Law Group PLLC has used its considerable expertise and experience in litigating wage-and-hour cases to provide a satisfactory result to Plaintiffs. Indeed, each Plaintiff confirms in the Agreement that he or she is "satisfied with the legal representation and services received from his or her attorneys, PLG, and believes that the Settlement Payment and the Allocations, including PLG's Allocation, representing attorneys' fees and costs, represent a fair and reasonable compromise of the disputes in the Litigation and are consistent with his or her retainer agreement with PLG." *Id.* § 4(Q). PLG reviewed every term of the Agreement in Spanish and English with Plaintiffs before they signed it. *See* Ex. 2 at 12/15/20 (Zoom meeting); 12/17/20 (email to clients summarizing all main points of agreement in English and Spanish).

In accordance with the retainer agreement Plaintiffs signed with PLG (*see* Ex. 1 § 4(Q)), PLG's attorneys' fees of $58,600.00 equal 33.33% of the Settlement Amount after reimbursement of the $400 filing fee that PLG incurred in prosecuting this matter. The contingency fee Plaintiffs agreed to in their retainer agreements with PLG should be approved. *In re Lawrence*, 24 N.Y. 3d 320, 339 (2014) ("Absent incompetence, deception or overreaching, contingent fee agreements that are not void at the time of inception should be enforced as written."). "A contingency fee is presumptively valid where 'the proposed fee amount is exactly one-third of the net settlement amount,'" as it is in this case. *Angamarca v. Hud-Moe LLC*, No. 18-CV-1334 (RA), 2018 WL 6618412, at *1 (S.D.N.Y. Dec. 17, 2018) (quoting *Yunjian Lin v. Grand Sichuan 74 St Inc.*, No. 15-CV-2950 (RA), 2018 WL 3222519, at *5 (S.D.N.Y. July 2, 2018). Furthermore, "courts in this Circuit have routinely found an award representing one third of the settlement amount to be reasonable." *Yong Yuan Wang v. Mandarin Glen Cove, Inc.*, No. 18-CV-03266 (DLI) (CLP), 2019 WL 5695910, at *2 (E.D.N.Y. Sept. 30, 2019) (citing *Romero v. Westbury Jeep Chrysler Dodge, Inc.*, No. 15-cv-4145 (ADS) (SIL), 2016 WL 1369389, at *2 (E.D.N.Y. Apr. 6, 2016)); *see also Calle v. Elite Specialty Coatings Plus, Inc.*, No. 13-CV-6126 (NGG) (VMS)), 2014 WL 6621081, at *3 (E.D.N.Y. Nov. 21, 2014) ("A one-third contingency fee is a commonly accepted fee in this Circuit.") (collecting cases).

Most recently, the Second Circuit has held that there is no reason to limit attorneys' fees in FLSA actions to 33.33% of the amount recovered. *See Fisher v. SD Prot. Inc.*, 948 F.3d 593, 603 (2d Cir. 2019) ("Neither the text nor the purpose of the FLSA . . . supports imposing a proportionality limit on recoverable attorneys' fees," because such a rule would be "inconsistent with the remedial goals of the FLSA"). The fees requested here are slightly less than PLG's lodestar, as reflected in PLG's contemporaneous billing records. *See* Ex. 2. The fees and costs requested are fair and reasonable as equaling essentially the amounts billed (Ex. 2), as being "consistent with the terms of Plaintiffs' retainer agreements" (Ex. 1 § 4(Q)), *Chun Lan Guan*, 2020 WL 1289517, at *4, and as amounting to a fair and reasonable payment in light of the "considerable risk" PLG undertakes by representing employees in FLSA cases on a contingency fee basis.[3] *See, e.g., Sanchez v. JMP Ventures, L.L.C.*, No. 13 Civ. 7264 (GWG), 2015 WL 539506, at *6 (S.D.N.Y. Feb. 10, 2015). Accordingly, PLG respectfully requests that the Court approve the one-third contingency fee in this case as fair and reasonable.

We thank the Court for its time and consideration of this matter. If the Court needs any additional information for purposes of its review, please feel free to contact us.

Respectfully submitted,

Gianfranco Cuadra

Enclosures

cc: Alexander Wilde Leonard, Esq.
Jeffrey Alan Miller, Esq.

---

[3] *See, e.g., Cortes v. New Creators, Inc.*, No. 15-CV-5680, 2016 WL 3455383, at *9 (S.D.N.Y. June 20, 2016) (noting risks associated with contingent fees in FLSA cases) (collecting cases). In this regard, PLG notes contingency awards sometimes represent only a fraction of its lodestar, and PLG is sometimes unable to collect fees awarded. *See, e.g., Hussain v. Burton and Doyle of Great Neck, LLC*, No. 14-CV-05924 (SIL) (E.D.N.Y. June 16, 2020) (after almost six years of litigation, including a seven-day jury trial, attorneys' fee award of $275,000 uncollectible due to personal and business bankruptcy); *Zavala v. JT Restaurant Corp. et al.*, No. 18-CV-01530 (ADS)(ARL) (E.D.N.Y. Apr. 22, 2020) ($35,000 judgment remains outstanding following defendants' default on payments under settlement agreement); *Augusto Corrales v. AJMM Trucking Corp.*, No. 19-CV-4532 (LJL), 2020 WL 1911189, at *4 (S.D.N.Y. Apr. 20, 2020) (PLG to date has not recovered any of the $16,292.38 attorneys' fee awarded on default judgment).